LEOPOLD ZIMMERMANN et al., Appellants, v. HENRY G.
TIMMERMANN et al., Respondents.

1. MORTGAGE BOND OF RAILROAD CORPORATION — WHEN ISSUED.
A mortgage bond of a railroad corporation represents a loan of money
from the holder. It is issued when it comes into the hands of the holder
so executed and delivered as to bind the obligor. It acquires no validity
before delivery.

2. CONTRACT FOR DELIVERY OF BONDS CONSTRUED. Plaintiffs and
defendants entered into an agreement for the purchase and sale of bonds
"when, as and if issued." Plaintiffs claimed that they had been issued,
and demanded the bonds agreed to be delivered. Defendants refused on
the ground that they had not been issued. In fact part of the bonds had
been issued, and the trial court found that "before the commencement of
this action the said bonds were duly issued." *Held*, that it was not neces-
sary that the full amount of the bonds provided for by the mortgage
should be issued before defendants were bound to perform their contract,
and that the issue of such an amount as would have enabled defendants,
in the exercise of due diligence, to obtain the bonds and make delivery of
them, was sufficient.

3. DAMAGES FOR NON-DELIVERY OF BONDS. The amount of the dam-
ages sustained by plaintiffs was properly based upon the price of bonds
in the city which was expressly found to be the best available market.

*Zimmermann* v. *Timmermann*, 120 App. Div. 218, reversed.

(Argued November 16, 1908; decided December 8, 1908.)

APPEAL from an order of the Appellate Division of the
Supreme Court in the first judicial department, entered
August 5, 1907, which reversed a judgment in favor of plain-
tiffs entered upon a decision of the court at a Trial Term
without a jury and granted a new trial.

The nature of the action and the facts, so far as material,
are stated in the opinion.

*Alton B. Parker* and *Benjamin N. Cardozo* for appel-
lants. At the time when the plaintiffs demanded delivery
the bonds were issued, and the contracts had matured.
(*Hirsch* v. *Jones*, 191 N. Y. 195; *Ryan* v. *Train*, 95 App.
Div. 71; *Duryea* v. *Bonnell*, 18 App. Div. 151; *Maguire* v.
*Halsted*, 18 App. Div. 228; *Selleck* v. *Tallman*, 87 N. Y.

106; *Stokes* v. *Mackay,* 147 N. Y. 235; 82 Hun, 452; *Baumann* v. *Pinckney,* 118 N. Y. 611; *Littlejohn* v. *Shaw,* 159 N. Y. 188; *Blewett* v. *Baker,* 58 N. Y. 611; *Lawrence* v. *Miller,* 86 N. Y. 137.) The contention is untenable that the defendants' contract must be interpreted in the light of the so-called participation agreement. (*Hankinson* v. *Vantine,* 152 N. Y. 20.) The plaintiffs have sustained damage as a result of the defendants' default. In the absence of a market value in New York the market value in San Francisco should be adopted as the test. (*G. T. Co.* v. *Phillips,* 23 Wall. 471, 480; 2 Sutherland on Damages, § 653; *Syles* v. *Hagy,* 15 N. Y. Wkly. Dig. 456; *Todd* v. *Gamble,* 148 N. Y. 382; *Rice* v. *Manley,* 66 N. Y. 82; *Booth* v. *S. D. Mill Co.,* 60 N. Y. 487, 496; *Elbridger* v. *Armstrong,* L. R. [9 Q. B.] 473; *Wallingford* v. *Kaiser,* 191 N. Y. 394; *Sloan* v. *Baird,* 12 App. Div. 481; *Potter* v. *Merchants' Bank,* 28 N. Y. 641; *Booth* v. *Powers,* 56 N. Y. 22; *Thayer* v. *Manley,* 73 N. Y. 305.)

*Joseph Fettretch, George H. Earle, Jr., John Henry Hammond, William V. Rowe, Charles J. McDermott* and *James W. McDermott* for respondents. At the time when the plaintiffs demanded delivery the bonds were not issued and the contracts had not matured. (*S. T. Co.* v. *Cohen,* 184 N. Y. 308; *Ward* v. *Whitney,* 8 N. Y. 447; *Compton* v. *Compton,* 9 East, 273; *Filley* v. *Pope,* 115 U. S. 200; *Hill* v. *Sumner,* 132 U. S. 118; *Harrison* v. *Fortledge,* 141 U. S. 63; *Bowes* v. *Shand,* L. R. [2 App. Cas.] 455; *Norrington* v. *Wright,* 115 U. S. 203; *Browne* v. *Patterson,* 165 N. Y. 470; *Gillett* v. *Bank of America,* 160 N. Y. 549.) The plaintiffs have not sustained any damage. The complaint should have been dismissed as the plaintiffs failed to prove damages. (1 Sedg. on Damages [8th ed.], § 170; *Dana* v. *Fiedler,* 12 N. Y. 40; *Nelson* v. *P. F. Co.,* 55 N. Y. 480.)

WILLARD BARTLETT, J. In this action the plaintiffs, constituting the firm of Zimmermann and Forshay, bankers and

brokers in the city of New York, seek to recover of the defendants, who are also bankers and brokers in the same city, under the firm name of Timmermann, Dahlgren & Co., damages for the breach of contracts in writing whereby the defendants agreed to sell, and the plaintiffs agreed to buy, certain bonds of a California corporation, known as the United Railroads of San Francisco.

The following is a copy of one of the contracts, the others being like it in form:

"NEW YORK, *March* 17, 1902.

"100 Bonds at 89 and int. W. I.

"We have sold to Zimmermann & Forshay one hundred thousand dollars par value of the New 4% Bonds of the United Railroads of San Francisco at 89 per cent payable and deliverable when, as and if issued, with accrued interest at the rate of four per cent per annum, either party having the right to call for deposits according to the requirements of Article XXX of the Constitution of the N. Y. Stock Exchange, and on the failure of the party called upon to comply with the call for deposits, which contract shall mature, with the right and authority to the party not in default to close the contract in accordance with the rules of the New York Stock Exchange.

"Due when issued.

"TIMMERMANN, DAHLGREN & CO."

The plaintiffs in each instance executed a corresponding obligation to purchase the bonds on the terms and conditions thus specified. On the 21st day of June, 1902, the plaintiffs, claiming that the bonds had been issued, demanded the delivery thereof from the defendants. The defendants refused to comply with the demand, on the ground that it was premature. They wrote to the plaintiffs: "We have been notified by Messrs. Brown Brothers & Co., who are the parties to issue the bonds, that said bonds have not been so issued, and hence that they are not entitled to be delivered under the agreement of sale made with you." The learned judge before whom the case was tried (a jury having been waived) found

that the bonds had been issued by the United Railroads of San Francisco at the time when the demand was made, and rendered judgment in favor of the plaintiffs for $12,837.90, measuring their damages with reference to the market rate for the bonds in San Francisco at the date of the breach of the contract. The Appellate Division has reversed this judgment because only $3,500,000 of the $20,000,000 issue of bonds contemplated by the United Railroads of San Francisco had actually been issued when the plaintiffs demanded of the defendants the delivery of their bonds under the contract. In the opinion of that learned court no right accrued to the plaintiffs to call for a delivery of any of the bonds until the issue of the $20,000,000 was complete. The disposition of this appeal depends upon the correctness of that view.

The bonds in question were the outcome of a syndicate plan for the acquisition of a controlling interest in the principal independent street surface railroads in the city of San Francisco and the consolidation of their lines into a single corporate organization to be known as the United Railroads of San Francisco. The agreement for effectuating this scheme provided among other things for the creation and issue by this new corporation in payment for the properties of the constituent companies of $40,000,000 of stock, common and preferred, and $20,000,000 of bonds. The bonds were to be secured by a mortgage upon the properties and franchises of the constituent companies. The stock of these companies was acquired through the agency of Brown Brothers & Co., to whom the bonds were to be delivered under an agreement which gave them the right to offer such bonds for sale at any time prior to February 1, 1903, at the best price obtainable, being not less than 90% of their face value with accrued interest. On or before June 16th, 1902, bonds to the amount of $3,500,000, duly certified by the trustee under the mortgage, were delivered by the trustee, pursuant to directions from Brown Brothers & Co. to a San Francisco syndicate, by which they had been purchased and by which large amounts of them were immediately resold. It is this delivery of

$3,500,000 which the plaintiffs insist was an issue of the bonds under the "when, as and if issued" clause of the contract between the parties to this action.   The defendants, on the other hand, contend (and in this they have been sustained by the Appellate Division) that the words "when, as and if issued" relate only to the total issue of bonds contemplated by the scheme for the union of the San Francisco street railways, and that the plaintiffs could not rightfully demand performance of the contracts in controversy here until substantially the whole $20,000,000 of bonds had been issued. The fact that the plaintiffs may have had no knowledge of the terms of the plan under which the bonds were to be issued, was held by the court below to be entirely immaterial.

In order clearly to understand the position of the contending parties on this appeal, it is necessary to state somewhat more fully the facts concerning the formation of the syndicate for the purchase of the $20,000,000 of bonds of the United Railroads of San Francisco.   The syndicate agreement was executed on February 17, 1902, between the United Railways Investment Company of San Francisco of the first part, Brown Brothers & Co., as syndicate managers, of the second part, and such persons and corporations as should actually sign the agreement or accept participation thereunder or become holders of subscription receipts issued by the managers, parties of the third part.   These parties of the third part were described in the agreement as "Participants."   The agreement provided that the Investment Company would cause a corporation to be organized to be known as the United Railroads of San Francisco, to which it would sell the stock of certain specified railroad companies in San Francisco, "it being intended that said corporation, when formed, shall also acquire the railroad lines, properties and franchises of such companies."   The United Railroads corporation was then to deliver to the Investment Company, in payment for these shares, $17,408,000 (subsequently increased to $20,000,000) of its bonds, and $40,000,000 of its stock, common and preferred.   The Investment Company was thereafter to deliver

to Brown Brothers & Co. as the representatives of the share-
holders in the constituent railroads these bonds and this stock.
The participants in the agreement were to receive for each
$1,000 paid by them $758.29 of the bonds, or the proceeds of
as many as might be sold prior to February 1, 1903, and the
balance in preferred and common stock. The participants cov-
enanted and agreed that Brown Brothers & Co., the managers,
should have the absolute control of the bonds of the United
Railroads of San Francisco until the 1st day of February,
1903, and that they might offer the same at public issue or
private sale at any time prior to said date at the best price
obtainable in their judgment, not to be less than 90% of the
face value thereof, together with accrued interest. The agree-
ment further provided for the issuance to the participants,
upon the payment of their subscriptions respectively, of
negotiable subscription receipts which recited that the holder
thereof fully consented to all the terms and conditions of the
syndicate plan. The United Railroads of San Francisco, hav-
ing been duly organized, certified on March 31, 1902, that the
Investment Company had subscribed and paid for and was
entitled to receive $20,000,000 of its first general mortgage
4% gold bonds, said bonds to be delivered as soon as the
mortgage to secure the same should have been executed and
delivered and the bonds thereof created, engraved and issued.
Brown Brothers & Co. subsequently, in April, 1902, entered
into negotiations with Mr. I. W. Hellman of San Francisco
for the sale of $2,500,000 of the bonds, subsequently increased
to $3,500,000. The deed of trust or mortgage was recorded
on June 7, 1902, and on June 16, 1902, $3,500,000 of the
bonds which had been duly certified were delivered to the
San Francisco syndicate represented by Mr. Hellman. The
bonds were thereafter sold and purchased almost daily in
the San Francisco market. One shipment of $100,000 was
made to the plaintiffs' firm and reached them in New York
on June 23, 1902. The plaintiffs' firm meantime had become
parties to the syndicate agreement, and as such had received
a number of participation receipts; but it does not appear

that any of these receipts came into their hands until March 27, 1902, after the principal contracts with the defendants had been made.

The feature of the contract in controversy (and I shall speak of only one contract, as all the agreements were alike in this respect) which has given rise to the difference between the parties and to this litigation as a consequence thereof, is the phrase " when, as and if issued." The defendants insist .that no obligation arose under the contract on their part to deliver any bonds whatever to the plaintiffs until the whole $20,000,000 of bonds had been issued or, at all events, until February 1st, 1903, up to which date Brown Brothers & Co. were authorized to market the bonds under the syndicate agreement. The plaintiffs, on the other hand, contend that a contract to deliver bonds when issued is a contract to deliver them when they shall have been issued in such reasonable quantities as to render it possible for the promisor with the exercise of due diligence to procure them. This time had arrived, they say, when $3,500,000 of the bonds had been sold and actually delivered by the direction of Brown Brothers & Co. to the Hellman syndicate in San Francisco. On that day, June 16, 1902, the bonds were procurable in the San Francisco market, which was readily accessible by telegraph from New York, in quantities amply sufficient to have enabled the defendants to deliver the amount called for by the contract. This issue of the bonds, although less than the whole issue eventually contemplated, is asserted to have been the issuance of such a reasonable amount as to enable the defendants with due diligence to procure the bonds and make delivery. The trial court, after finding that the contract was made as alleged in the complaint, found that " thereafter and before the commencement of this action the said bonds were duly issued by the said corporation, the United Railroads of San Francisco." There was a further finding made at the request of the defendants as to the certification and delivery to Hellman as the manager of the San Francisco syndicate of the $3,500,000 of bonds on June 16, 1902. Considering these

findings together, they must be deemed equivalent to a find-
ing that the $3,500,000 of bonds thus actually issued was an
amount sufficient to enable the defendants to comply with
the conditions of the contract on their part.

I think that this issue made the contract in suit operative
against the defendants. A bond is issued when it comes into
the hands of the holder so executed and delivered as to bind
the obligor. That was the case with these $3,500,000 of
bonds when they were acquired by the San Francisco
syndicate.

The ordinary mortgage bond of a railroad corporation rep-
resents a loan of money from the holder to the borrower. It
becomes a valid obligation and must be regarded as having
been issued by the corporation when it is actually delivered
for a valuable consideration. (*Brownell* v. *Town of Green-
wich*, 114 N. Y. 518, 530.) Although completely executed
in due form to be used as security for borrowed money, such
bonds acquire no validity before delivery and do not consti-
tute property capable of seizure under attachment or execu-
tion. (*Coddington* v. *Gilbert*, 17 N. Y. 489 ; *Sickles* v. *Rich-
ardson*, 23 Hun, 559.) After delivery, however, they become
valid and effective obligations enforcible at the instance of the
lender or whoever else may lawfully acquire them.

I can find no basis either in the language of the contract itself
or in that of the syndicate agreement, even if the plaintiffs are
to be deemed chargeable with a knowledge of the contents
of that agreement by reason of the fact that they subsequently
became holders of participation receipts, for the proposition
that the contract was not to become effective or bind the
defendants at all until the whole $20,000,000 of bonds had
been issued. If that were the correct construction, it would
constitute no binding obligation upon them, even if $19,000,000
of bonds had been put upon the market right in New York,
where the defendants would not have had the slightest diffi-
culty in acquiring the amount which they had undertaken to
sell to the plaintiffs. It seems to me that the most that they
could properly insist on was what the learned counsel for the

appellants frankly conceded upon the argument of the appeal to have been their right — namely, that the issue should be sufficiently large to permit compliance in the exercise of due diligence. When, however, they were asked to perform they assumed no such position. If, when the plaintiffs demanded fulfillment of the contract, the defendants had asserted that in view of the fact that the bonds had been issued in San Francisco while they were called upon to make delivery in New York the time allowed was not sufficient, then and there, under all the circumstances, a very different question would be presented. The defendants, however, did nothing of the sort. They denied any liability whatsoever under the contract unless and until $20,000,000 of bonds should be issued. In my opinion this position was wholly untenable. Assuming, as I do, that the issue of bonds contemplated by both parties to the contract was one reasonably large enough to make fulfillment practicable to the seller at the time when delivery should be called for, if the defendants had then insisted that such was not the case and had asked for more time until a larger amount of bonds had been issued, a question of fact would have been presented to the trial court upon which the defendants might have prevailed. As I have already pointed out, however, the findings made by the trial court are equivalent to a finding that the issue of $3,500,000 was the issue of such an amount as would have enabled the promisors to obtain the bonds and make due delivery of the same at the time when the request was made. The Appellate Division has reversed on the law only, and, therefore, this finding of fact, having some support at least in the evidence, remains unassailed. If, as I think, the Appellate Division erred in holding as matter of law that an issue of all the bonds was necessary in order to charge the defendant at all, this finding suffices to sustain the judgment of the trial court.

I cannot perceive how any knowledge which the plaintiffs may have acquired through the participation receipts or otherwise as to the contents of the syndicate agreement can be

held to affect the construction or interpretation of the contract between them and the defendants.   There was nothing in that agreement which postponed the issuance of the bonds till February 1, 1903; on the contrary, it distinctly contemplated the right on the part of the managers to sell them before that date either at public issue or private sale at the best price obtainable in the judgment of the managers, provided it should not be less than 90%, with accrued interest. In that event the participants were to receive the proceeds of such sales in lieu of the bonds.   It seems to me, therefore, that undue importance has been attached to the question as to how much the plaintiffs knew about the contents of this agreement.

No error was committed at the trial as to the measure of damages.   The plaintiffs' loss was estimated with reference to the price of the bonds at San Francisco at the date of the breach, and it was expressly found that the city of San Francisco was the best available market for the bonds.   It is true that there are some indications in the record of an intention on the part of the plaintiffs at one time to seek a recovery based on fictitious sales in the New York market — by which the amount of the defendants' liability would have been greatly increased.   If this was in fact attempted, that circumstance would amply justify the animadversions made upon the conduct of the plaintiffs in this respect not only by the Stock Exchange but by the counsel for the defendants on the argument of the present appeal.   No court could or would allow such an effort to succeed.   It is deserving of the most emphatic condemnation.   It is only fair, however, to counsel who represented the plaintiffs upon the trial and in this court to say that they disavowed any claim to recover on the basis of the New York sales to which reference has been made.

The order of the Appellate Division should be reversed and the judgment of the Trial Term affirmed, with costs in both courts to the appellants.

CULLEN, Ch. J., HAIGHT, WERNER and CHASE, JJ., concur; GRAY and HISCOCK, JJ., dissent.

Order reversed, etc.