Matter of Coalition for Cobbs Hill v City of Rochester (2021 NY Slip Op 02948)





Matter of Coalition for Cobbs Hill v City of Rochester


2021 NY Slip Op 02948


Decided on May 7, 2021


Appellate Division, Fourth Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on May 7, 2021
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: WHALEN, P.J., SMITH, CURRAN, TROUTMAN, AND DEJOSEPH, JJ.


854 CA 19-01080

[*1]IN THE MATTER OF COALITION FOR COBBS HILL, BY ITS CO-CHAIRPERSON THOMAS PASTECKI, COBBS HILL VILLAGE TENANTS' ASSOCIATION, BY ITS PRESIDENT LEE SENGBUSCH, LEE SENGBUSCH, CAROLINE REAMORE, KENNETH BOICE, CAROL WILSON, BARBARA VANWIE, BRENT GRATTAN, THE ABC STREETS NEIGHBORHOOD ASSOCIATION, INC., THE FRIENDS OF WASHINGTON GROVE, INC., UPPER MONROE NEIGHBORHOOD ASSOCIATION, BY ITS PRESIDENT CHRISTENA STEVENS, AND NUNDA BOULEVARD ASSOCIATION, BY ITS PRESIDENT JEFF MILLS, PETITIONERS-PLAINTIFFS-APPELLANTS,
v
CITY OF ROCHESTER, CITY OF ROCHESTER PLANNING COMMISSION, CITY OF ROCHESTER MANAGER OF ZONING, PLYMOUTH GARDENS, INC., ROCHESTER MANAGEMENT, INC., RESPONDENTS-DEFENDANTS-RESPONDENTS, ET AL., RESPONDENTS-DEFENDANTS. 






KNAUF SHAW LLP, ROCHESTER (ALAN J. KNAUF OF COUNSEL), FOR PETITIONERS-PLAINTIFFS-APPELLANTS.
TIMOTHY R. CURTIN, CORPORATION COUNSEL, ROCHESTER (THOMAS J. WARTH OF COUNSEL), FOR RESPONDENTS-DEFENDANTS-RESPONDENTS CITY OF ROCHESTER, CITY OF ROCHESTER PLANNING COMMISSION, AND CITY OF ROCHESTER MANAGER OF ZONING. 
WOODS OVIATT GILMAN LLP, ROCHESTER (WARREN B. ROSENBAUM OF COUNSEL), FOR RESPONDENTS-DEFENDANTS-RESPONDENTS PLYMOUTH GARDENS, INC., AND ROCHESTER MANAGEMENT, INC. 


 Appeal from a judgment (denominated order and judgment) of the Supreme Court, Monroe County (William K. Taylor, J.), entered May 2, 2019 in a CPLR article 78 proceeding and declaratory judgment action. The judgment, among other things, dismissed the petition-complaint. 
It is hereby ORDERED that the judgment so appealed from is unanimously affirmed without costs.
Memorandum: This appeal involves the redevelopment of Cobbs Hill Village, an affordable housing community for seniors located on property owned by respondent-defendant Plymouth Gardens, Inc. (Plymouth). In 1957, after receiving approval from the New York State Legislature (L 1956, ch 453), respondent-defendant City of Rochester (City) sold the Cobbs Hill Village property to Plymouth's predecessor in interest. The deed conveying the property to Plymouth (1957 deed) contained several restrictive covenants, one of which provided that ownership of the property would revert to the City once the mortgage on it had been repaid in full. Another required that any plans or specifications for construction on the property "be subject to the approval of" respondent-defendant City of Rochester Planning Commission (CPC). In 1957, Cobbs Hill Village, which contained 60 apartment units, was constructed on the property.
In 2016, Plymouth and respondent-defendant Rochester Management, Inc. (collectively, corporate respondents) announced their intent to redevelop Cobbs Hill Village by demolishing the existing complex and constructing in its place several new apartment buildings containing over 100 apartment units (Project). Shortly thereafter, the City's corporation counsel supplied a letter that generally outlined the Project's approval process: (1) financing, (2) review pursuant to the State Environmental Quality Review Act ([SEQRA] ECL art 8), (3) site plan review, and (4) the CPC's approval.
With respect to the CPC's approval, the corporation counsel recommended that the CPC use the special permit approval standard in Rochester Zoning Code (Zoning Code) § 120-192 (B). With respect to financing, the Rochester City Council (City Council) enacted an ordinance granting the Mayor of Rochester (Mayor) the authority to enter an agreement extending the City's reversionary interest in the property so that Plymouth could obtain financing for the Project.
With respect to the SEQRA process, as relevant on appeal, the Mayor's office had a standing agreement with the City Council providing that the Mayor's office would act as lead agency for all projects involving both entities. A similar standing agreement between the Mayor and respondent-defendant City of Rochester Manager of Zoning (Zoning Manager) provided that the Zoning Manager would act as lead agency for actions involving those entities. Furthermore, the Zoning Manager had a similar agreement with the CPC whereby the Zoning Manager would be the lead agency for actions involving those entities. Ultimately, as a result of those overlapping standing agreements, the Zoning Manager acted as the lead agency on the Project. The corporate respondents submitted part 1 of the environmental assessment form (EAF), which indicated that the Project would have only a small impact on geological features, on plants and animals, and on a critical environmental area, and further indicated that the Project was consistent with community plans and community character. In issuing preliminary site plan findings, the Zoning Manager noted that the Project was a Type I action under SEQRA and that the Project had been submitted to the Monroe County Department of Planning and Development (Planning Department) pursuant to General Municipal Law § 239-m. The Zoning Manager issued a negative declaration, concluding that the Project would not result in any significant adverse effects on the environment.
After conducting a public hearing, the CPC initially reserved decision on its review of the corporate respondents' application for approval of the Project's plans and specifications due to concerns about the Project and requested further information on the application. The corporate respondents submitted a revised application to address the CPC's concerns. Thereafter, the CPC conditionally approved the Project based on its evaluation of the Project under the standard set forth in Zoning Code § 120-192 (B). In response to the revised application, the Zoning Manager issued an amended negative declaration.
Petitioners-plaintiffs (petitioners), consisting of current Cobbs Hill Village tenants and organizations who represent those tenants and the people who live in adjacent neighborhoods, commenced this hybrid CPLR article 78 proceeding and declaratory judgment action asserting in a petition-complaint four causes of action. The first cause of action sought to annul the Zoning Manager's negative declaration based on assorted violations of SEQRA. The second cause of action sought to annul the CPC's determination conditionally approving the Project on the ground that the Project did not satisfy the Zoning Code's special permit standard. The third cause of action sought to annul the CPC's determination based on allegations that the Project violated, inter alia, the terms of the 1957 deed. The fourth cause of action sought to annul the CPC's determination based on allegations that the Project violated General Municipal Law § 239-m because the revised application was not resubmitted to the Planning Department. The corporate respondents moved for summary judgment seeking dismissal of, inter alia, the third cause of action, a motion that was effectively joined by the City, the CPC, and the Zoning Manager (collectively, City respondents). Petitioners appeal from a judgment that dismissed the petition-complaint in its entirety.
Initially, we note that this is properly only a CPLR article 78 proceeding because the relief sought by petitioners—i.e., review of the City respondents' administrative determinations—is available under CPLR article 78 without the necessity of a declaration (see Matter of Weikel v Town of W. Turin, 188 AD3d 1718, 1720 [4th Dept 2020]; see generally CPLR 7801; Matter of Level 3 Communications, LLC v Chautauqua County, 148 AD3d 1702, [*2]1703 [4th Dept 2017], lv denied 30 NY3d 913 [2018]).
We conclude that Supreme Court properly dismissed the first cause of action. Contrary to petitioners' contention, we conclude that the Zoning Manager's establishment as lead agency on the Project pursuant to the overlapping standing agreements was not deficient (see generally 6 NYCRR 617.2 [v]; Matter of Coca-Cola Bottling Co. of N.Y. v Board of Estimate of City of N.Y., 72 NY2d 674, 680 [1988]). A lead agency is "an involved agency principally responsible for undertaking, funding or approving" a project (6 NYCRR 617.2 [v]). An involved agency is "an agency that has jurisdiction by law to fund, approve, or directly undertake an action"—i.e., the discretionary authority to make such a determination (6 NYCRR 617.2 [t]). Under SEQRA, "[a] lead agency . . . may not delegate its responsibilities to any other agency" (Matter of Penfield Panorama Area Community v Town of Penfield Planning Bd., 253 AD2d 342, 350 [4th Dept 1999]).
Here, we note that the Mayor's office was an involved agency on the Project because the Mayor had the discretionary authority to approve or disapprove the ordinance needed to help obtain financing for the Project (see Rochester City Charter § 5-8 [C]; see also 6 NYCRR 617.2 [t]). Because the Mayor had approval authority over the Project's financing, it was not dispositive that the Mayor was not listed among the involved agencies in the EAF or that the Mayor did not identify herself as an involved agency in her communications with the City Council. Because the Mayor's office was an involved agency, it could have acted as lead agency based on its role in approving the Project's financing (see generally Sunshine Chem. Corp. v County of Suffolk, 104 AD2d 869, 871 [2d Dept 1984], lv denied 64 NY2d 604 [1985], appeal dismissed 64 NY2d 775 [1985]), and based on its standing agreement with the City Council (see generally SEQR Handbook at 60 [4th ed 2020]).
Additionally, there is no dispute that the Zoning Manager—as the entity responsible for, inter alia, issuing preliminary site plan findings prior to review by the CPC in this case—was an involved agency that was eligible to serve as lead agency pursuant to the standing agreements it had with the Mayor's office and the CPC (see Zoning Code § 120-191 [D]). Indeed, we conclude that, ultimately, the Zoning Manager properly acted as lead agency on the Project based on the overlapping standing agreements between those entities. We observe that this is not a case where the establishment of the Zoning Manager as lead agency was an improper attempt to shield the responsible agency from performing the requisite environmental review as part of its decision-making process, or where the proper lead agency abdicated its responsibilities under SEQRA (see generally Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d 219, 234 [2007]; Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay, 88 AD2d 484, 492-493 [2d Dept 1982]).
We also reject petitioners' contention with respect to the first cause of action that the Zoning Manager failed to comply with the requirements of SEQRA in issuing a negative declaration. The record establishes that the Zoning Manager took the requisite hard look and provided a reasoned elaboration of the basis for her determination regarding the potential impacts of the Project on traffic and lead contamination (see Matter of Friends of P.S. 163, Inc. v Jewish Home Lifecare, Manhattan, 30 NY3d 416, 431 [2017], rearg denied 31 NY3d 929 [2018]; Matter of Wooster v Queen City Landing, LLC, 150 AD3d 1689, 1692 [4th Dept 2017]; Matter of Wellsville Citizens for Responsible Dev., Inc. v Wal-Mart Stores, Inc., 140 AD3d 1767, 1768-1769 [4th Dept 2016]).
With respect to the traffic impacts of the Project, the Zoning Manager specifically considered a traffic study of the site, which was prepared by an outside firm and subsequently reviewed by the Monroe County Department of Transportation (DOT). Both the outside firm and the DOT concluded that the Project would not result in an impact on traffic safety or in a significant traffic increase during peak hours of travel. Further, the Zoning Manager considered that, as a mitigation measure, the Project would include the creation of an additional road entrance, which was intended to offset any increase in traffic caused by the increased number of apartment units at the site. Although the Zoning Manager did not specifically evaluate every possible permutation of how traffic may be affected by the Project, that does not mean that the Zoning Manager did not take a hard look, and to conclude otherwise would effectively abandon the "rule of reason" that governs the SEQRA analysis (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 417 [1986]; see Matter of Eadie v Town Bd. of Town of N. [*3]Greenbush, 7 NY3d 306, 318 [2006]; Matter of Neville v Koch, 79 NY2d 416, 425 [1992]).
With respect to lead contamination at the Project site, the Zoning Manager properly relied on a soil study that concluded that there was no indication that there were any metals located on the premises (see generally Friends of P.S. 163, Inc., 30 NY3d at 431). To the extent that petitioners contend the Zoning Manager failed to consider evidence of lead contamination already present at the Project site—i.e., from an outdoor shooting range operated on or near the site over a century ago—we note that this issue was never raised at any point during the administrative approval or SEQRA process, but rather was raised for the first time in petitioners' reply papers submitted in the underlying proceeding. Thus, we do not consider those facts in reviewing whether the Zoning Manager took a hard look at the potential risk posed by lead contamination (see Matter of Miller v Kozakiewicz, 300 AD2d 399, 400 [2d Dept 2002]; Aldrich v Pattison, 107 AD2d 258, 267-268 [2d Dept 1985]; see generally Matter of Kahn v Planning Bd. of City of Buffalo, 60 AD3d 1451, 1451-1452 [4th Dept 2009], lv denied 13 NY3d 711 [2009]). Based on the foregoing, we conclude that the Zoning Manager "complied with the requirements of SEQRA in issuing the negative declaration . . . [,] that the 'designation as a [T]ype I action does not, per se, necessitate the filing of an environmental impact statement . . . , [and that no such statement] was . . . required here' " (Wooster, 150 AD3d at 1692).
We also reject petitioners' contention that the Zoning Manager improperly issued a conditioned negative declaration in a Type I action. It is well settled that "the SEQRA regulations do not authorize the issuance of a conditioned negative declaration for Type I actions . . . A conditioned negative declaration may be issued only for unlisted action[s]" (Matter of Ferrari v Town of Penfield Planning Bd., 181 AD2d 149, 151 [4th Dept 1992] [internal quotation marks omitted]; see 6 NYCRR 617.2 [h]; 617.7 [d]). In determining whether a lead agency has improperly issued a conditioned negative declaration in a Type I action, courts consider "(1) whether the project, as initially proposed, might result in the identification of one or more 'significant adverse environmental effects'; and (2) whether the proposed mitigating measures incorporated into part 3 of the EAF were 'identified and required by the lead agency' as a condition precedent to the issuance of the negative declaration" (Matter of Merson v McNally, 90 NY2d 742, 752-753 [1997]).
Although the Project's application plainly indicated that the Project, as initially proposed, might result in one or more significant environmental impacts, it is equally plain that neither the EAF nor the amended EAF contained any mitigation measures required by the Zoning Manager as a condition of issuing the negative declaration. Rather, the record discloses that the mitigating measures incorporated into the Project were adopted after the Zoning Manager issued the negative declaration and, in any event, were "incorporated as a part of an open and deliberate process[ to] negate[] the [P]roject's potential adverse effects" (id. at 753). There is nothing in the record to demonstrate that the negative declaration was conditioned on any changes made to the Project.
Petitioners also contend that the court erred in dismissing the second cause of action because the CPC's use of only the special permit standard of Zoning Code § 120-192 (B) to evaluate and approve the Project was arbitrary and capricious (see generally CPLR 7803 [3]; Matter of Peckham v Calogero, 12 NY3d 424, 431 [2009]). Specifically, they argue that the CPC's review was deficient because it did not consider whether the Project violated restrictive covenants contained in the 1957 deed. We note, initially, that there is no dispute that the Project's plans and specifications were subject to the approval of the CPC pursuant to the express terms of the 1957 deed. However, the 1957 deed was silent on the standard the CPC should use in performing its evaluation.
We conclude that the CPC's use of the special permit standard in its review of the Project was neither arbitrary nor capricious. "An action is arbitrary and capricious when it is taken without sound basis in reason or regard to the facts" (Matter of Murphy v New York State Div. of Hous. & Community Renewal, 21 NY3d 649, 652 [2013] [internal quotation marks omitted]). Here, the City's corporation counsel provided a reasonable explanation for his decision to recommend that the CPC use the special permit standard when evaluating the Project. Specifically, he noted that the use of that standard would allow the CPC to consider "a broad gamut of issues" concerning the Project's potential adverse impacts. To the extent that petitioners contend that the CPC erred in not evaluating the Project with respect to the 1957 [*4]deed's restrictive covenants, we note that the 1957 deed merely requires the CPC to review and approve plans and specifications for any project on the site—it does not require the CPC to evaluate the Project for compliance with the other restrictions contained in the deed.
Furthermore, to the extent that petitioners contend that the CPC's evaluation of the Project under the special permit standard of Zoning Code § 120-192 (B) was arbitrary and capricious, we reject that contention as well (see Matter of Osuchowski v City of Syracuse, 56 AD3d 1189, 1189 [4th Dept 2008]; see also CPLR 7803 [3]). Section 120-192 (B) required the CPC to consider whether the Project: would be in harmony with the Zoning Code and the Comprehensive Plan; would have any substantial or adverse effects on the neighborhood; would dominate the area; would be adequately served by essential public functions; and would result in destruction, loss or damage of any natural or historical features (see § 120-192 [B] [3] [a] [1] [a]-[e]). We note that the CPC's approval was accompanied with concrete findings that addressed each of the five factors set forth in that provision. Moreover, the CPC reached its determination after conducting multiple hearings and reviewing comments and recommendations about the Project. In addition, we note that the CPC initially reserved decision on the Project's application because of concerns about certain aspects of the project. In response, the corporate respondents submitted a revised application that addressed those concerns, after which the CPC issued its conditional approval. Thus, we conclude that the CPC's review of the Project under the Zoning Code was not arbitrary or capricious.
With respect to petitioners' contention that the court erred in granting the motion for summary judgment insofar as it sought dismissal of the third cause of action on the ground that petitioners lacked standing, we conclude that the court properly determined that they lacked standing to enforce the covenants in the 1957 deed. "Parties asserting third-party beneficiary rights under a contract must establish (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for [their] benefit and (3) that the benefit to [them] is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate [them] if the benefit is lost" (Mendel v Henry Phipps Plaza W., Inc., 6 NY3d 783, 786 [2006] [internal quotation marks omitted]). Although there existed a binding agreement between the City and Plymouth's predecessor in interest, we conclude that petitioners do not have standing with respect to the third cause of action because they failed to establish that the agreement was intended for the benefit of the tenants of Cobbs Hill Village or the surrounding neighbors (see generally Branch v Riverside Park Community LLC, 74 AD3d 634, 634-635 [1st Dept 2010], lv denied 15 NY3d 710 [2010]). Petitioners also failed to establish that the benefits of the agreement with respect to them were sufficiently immediate, which also supported the court's determination that they lacked standing to enforce the 1957 deed covenants (see Mendel, 6 NY3d at 786).
Finally, with respect to the court's dismissal of the fourth cause of action, petitioners contend that General Municipal Law
§ 239-m was violated because the Project was not resubmitted to the Planning Department to consider changes made to the Project. General Municipal Law § 239-m requires agencies to refer approval of, inter alia, site plans relating to real property located within 500 feet of "the boundary of any existing or proposed county or state park" to a county "planning agency" for a recommendation on the proposed action (§ 239-m [2], [3] [b] [ii]; see § 239-m [3] [a] [iv]). Failure to comply with the provision is a jurisdictional defect that renders the agency's action invalid (see Matter of Ernalex Constr. Realty Corp. v City of Glen Cove, 256 AD2d 336, 338 [2d Dept 1998]).
As relevant here, however, an agency is not required to provide multiple referrals to the planning agency unless "revisions [to the project] are so substantially different from the original proposal [that] the county or regional board should have the opportunity to review and make recommendations on the new and revised plans" (Ferrari, 181 AD2d at 152). Here, we conclude that the changes made to the Project after the initial referral to the Planning Department were not so substantial that a second referral was necessary. Although the number of apartment units to be constructed and the height of those buildings have increased since the original referral, those changes to the Project, when viewed in its totality, were relatively minor. That is especially true when the changes are viewed in relation to the Project's footprint as originally submitted to the Planning Department. Thus, we conclude that the court properly dismissed the fourth cause of action alleging a violation of General Municipal Law § 239-m.
Entered: May 7, 2021
Mark W. Bennett
Clerk of the Court